## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ———————————————————— | ) | |
| SCAN HEALTH PLAN | ) | |
| 3800 Kilroy Airport Way | ) | |
| Suite 100 | ) | |
| Long Beach, CA 90806 | ) | |
| | ) | Case No. |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES | ) | |
| Hubert H. Humphrey Building | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, D.C. 20201; | ) | |
| | ) | |
| CENTERS FOR MEDICARE & | ) | |
| MEDICAID SERVICES | ) | |
| 7500 Security Boulevard | ) | |
| Baltimore, MD 21244; | ) | |
| | ) | |
| XAVIER BECERRA, in his official | ) | |
| capacity as Secretary of the United States | ) | |
| Department of Health and Human Services | ) | |
| Hubert H. Humphrey Building | ) | |
| 200 Independence Avenue, S.W., | ) | |
| Washington, D.C., 20201; and | ) | |
| | ) | |
| CHIQUITA BROOKS-LASURE, in her | ) | |
| official capacity as Administrator, | ) | |
| Centers for Medicare & Medicaid Services | ) | |
| 7500 Security Boulevard | ) | |
| Baltimore, MD 21244, | ) | |
| | ) | |
| *Defendants.* | ) | |
| ———————————————————— | ) | |

## COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff SCAN Health Plan ("SCAN") submits the following Complaint for declaratory

and injunctive relief against Defendants Department of Health and Human Services ("HHS"), the

Centers for Medicare & Medicaid Services ("CMS"), Xavier Becerra, in his official capacity as Secretary of HHS, and Chiquita Brooks-LaSure, in her official capacity as Administrator of CMS (collectively, "Defendants"), and alleges as follows:

## INTRODUCTION

1.      SCAN brings this action to address two serious errors that CMS has made in calculating SCAN's 2024 Star Ratings, which, if not promptly corrected, will cost SCAN nearly *$250 million* in payments, impair its competitive and market position as a non-profit plan in an almost exclusively for-profit industry, and, most importantly, impede its ability to fulfill its mission of keeping more than 270,000 Medicare beneficiaries healthy and independent.

2.      These two errors, and CMS's refusal to address them administratively, are a disturbing, if textbook, example of rigid and unreasonable agency decision-making that should be set aside.  In the first error, CMS disregarded the plain text of its own regulation and adopted an "implied" approach, obscured within regulatory preamble and commentary, to calculate the 2024 Star Ratings.  This new methodology, which was never the subject of any proper rulemaking, improperly reduced SCAN's Star Ratings.  That result is directly contrary to the entire purpose of the regulation that CMS misapplied, which is to stabilize Star Ratings and thereby reduce wild, year over year ratings swings through use of explicit "guardrails."

3.      In the second error, CMS considered customer service data that was tainted when an auditor, or "secret shopper," asked vague and inaccurate questions in French that delayed SCAN's response time to the questions, which negatively impacted its Star Ratings.  Both of these actions fly in the face of CMS's own regulation, in violation of the Administrative Procedure Act ("APA").

4.      SCAN is one of the nation's foremost not-for-profit Medicare Advantage health plans ("MA Plans"), serving over 270,000 members in California.[1]  And unlike other MA Plans that also offer commercial health insurance plans, Medicare Advantage is SCAN's sole line of business and, as a result, SCAN's Star Ratings are critical to the company's ongoing operations.

5.      MA Plans, like SCAN, receive annual Star Ratings from CMS, based on "health and drug plan quality and performance measures," that are used by Medicare beneficiaries to shop for plans.  CMS also relies on the Star Ratings to determine MA Plans' eligibility to receive quality bonus payments and rebates that fund additional benefits for members.

6.      CMS calculates the Star Ratings based on a clear and unambiguous methodology that includes the calculation of measure-specific "cut points."

7.      In 2020, CMS promulgated regulations that revised its Star Ratings methodology to include "guardrails" that provide stability and predictability for MA Plans by reducing the fluctuation in the cut points used to calculate annual Star Ratings.

8.      CMS is required to use actual cut points from the prior year to determine the appropriate cut points that are used to calculate an MA Plan's Star Ratings.

9.       But in calculating the 2024 Star Ratings for SCAN, CMS applied an entirely different and new methodology that was not subject to any formal notice and comment rulemaking, and that directly contradicted the plain text of its own regulation.

10.      Instead of using actual plan performance data from 2023 to calculate 2024 cut points in accordance with the established guardrails for Star Ratings, CMS recalculated the 2023 cut points by applying the Tukey outlier deletion method prematurely.

---

[1]  SCAN also has affiliate health plans serving Medicare beneficiaries in Arizona, Nevada, New Mexico, and Texas.

11.     When SCAN confronted the agency about its use of recalculated data, CMS asserted it was justified to do so for vague and unidentified "intrinsic" reasons.

12.     The result was catastrophic: SCAN's 2024 Star Ratings dropped precipitously, disqualifying it from receiving quality bonus payments from CMS to fund critical supplemental benefits for its Medicare members and jeopardizing its ability to compete in the marketplace.

13.     SCAN further learned from CMS that, in deriving its 2024 Star Ratings, CMS included a flawed and improper secret shopper call initiated by CMS, which should have been excluded from consideration.

14.     Specifically, as part of its data collection, CMS placed a secret shopper call to SCAN posing as a French beneficiary, using objectively vague and ambiguous language that confused the translator and required additional time to clarify and address.

15.     This one delay, which was a product of deficiencies in the manner in which the secret shopper initiated the inquiry, reduced SCAN's overall Star Ratings.  That reduction resulted in SCAN becoming ineligible to receive hundreds of millions of dollars in quality bonus payments.

16.     In other words, CMS's own secret shopper created a delay, which CMS used in its calculation to reduce SCAN's Stars Ratings, thereby disqualifying SCAN from receiving quality bonus payments.  And because SCAN operates a single line of business as an MA Plan, the impact of CMS's 2024 Star Ratings is especially devastating to its operations and services.

17.     CMS's failure to adhere to its articulated methodology to calculate SCAN's Star Ratings constitutes an unexplained and unreasonable departure from its own regulation, which carries dire consequences for SCAN and other MA Plans.

18.     CMS further irrationally and unreasonably considered flawed data when calculating SCAN's 2024 Star Ratings.

19.     CMS's refusal to follow its own promulgated methodology and reliance on flawed data are arbitrary and capricious agency actions in violation of the APA.

20.     CMS's 2024 Star Ratings for SCAN should be vacated, and this matter should be remanded to the agency to adjust SCAN's 2024 Star Ratings based on a proper application of its regulation and use of data that is not inherently flawed.

21.     To prevent SCAN from suffering irreparable harm from CMS's improper rating, and in light of the fast-approaching annual bid process, the Court should expedite the resolution of this matter on the merits, and also preliminarily enjoin CMS from relying on its improper Star Ratings to determine SCAN's quality bonus payments under the Medicare Advantage program.

## **PARTIES**

22.     SCAN is a non-profit public benefit corporation incorporated in California with its principal place of business in Long Beach, California.

23.     Defendant HHS is the department of the federal government ultimately responsible for the federal Medicare and Medicaid programs.

24.     HHS has delegated its authority to administer the Medicare and Medicaid programs to CMS.  *See* 66 Fed. Reg. 35437.

25.     Defendant CMS is a federal agency within HHS with the primary oversight responsibility for the Medicare program and the federal portion of the Medicaid program.  It was created by the Reorganization Act of March 9, 1977.  *See* 66 Fed. Reg. 35437.

26.     Defendant Xavier Becerra is named in his official capacity as the Secretary of HHS.  *See* 42 C.F.R. § 405.1136(d)(1).

27.     Defendant Chiquita Brooks-LaSure is named in her official capacity as Administrator of CMS.  The CMS Administrator is responsible for the administration of the Medicare program, including the Star Ratings for MA Plans.  *Id.*

## JURISDICTION & VENUE

28.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the APA, 5 U.S.C. §§ 701 *et seq.*, and 42 U.S.C. §§ 1395 *et seq.*

29.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against officers and agencies of the United States and a substantial part of the events giving rise to SCAN's claims occurred in this District.

30.     The Complaint is timely under 28 U.S.C. § 2401(a).

## REGULATORY AND FACTUAL BACKGROUND

### *The Medicare Program And Star Ratings*

31.     The Medicare program, authorized under Title XVIII of the Social Security Act ("SSA"), is a federal program that provides health insurance benefits for Americans aged 65 years and older and certain disabled persons.  *See* 42 U.S.C. §§ 1395 *et seq.*

32.     CMS is the federal agency responsible for administering the Medicare program.

33.     Individuals enrolled in Medicare may elect to receive their benefits under Part C of the Medicare program, commonly referred to as the "Medicare Advantage" program, as an alternative to original Medicare.

34.     Under Part C, CMS contracts with private insurance payors, commonly known as Medicare Advantage Plans ("MA Plans"), to provide and arrange for Medicare-covered benefits for Medicare beneficiaries who enroll in their benefit plan.  *See* 42 C.F.R. § 422.4.

35.     Besides arranging and paying Medicare-covered benefits of Medicare beneficiaries, MA Plans typically provide supplemental benefits as well as lower co-payments and other cost sharing, which further reduce the cost of covered services for beneficiaries.

36.     The Medicare Advantage program is intended to shift the financial risk of providing health care to beneficiaries from the federal government to the privately run MA Plans in exchange for a per-member, per-month payment.

37.     MA Plans that are better at keeping their members healthy, by effectively managing their care and providing important related services, receive higher ratings, and overall, perform better in the marketplace.  *See generally* 42 C.F.R. § 422.160.

38.     By providing additional benefits beyond those covered by Medicare, MA Plans compete with original Medicare and with one another to convince beneficiaries to select their plan.

39.     In an effort to encourage MA Plans to offer high quality plans and to assist Medicare beneficiaries in selecting a Part C plan, CMS studies and surveys MA Plans for quality, compliance, and other metrics to develop numerical ratings for each MA Plan ("Star Ratings").

40.     The Star Ratings are based on a five-star scale, with 1 star being the lowest rating and 5 stars being the highest.  *See* 42 C.F.R. § 422.162(b); 42 C.F.R. § 422.166(h)(1)(ii).

41.     The Star Ratings are designed to be "a true reflection of the plan's quality" and must be based on data that is "complete, accurate, reliable, and valid."  83 Fed. Reg. 16440, 16521 (Apr. 16, 2018).

42.     Star Ratings information is widely available to Medicare beneficiaries to consider when choosing to enroll in an MA Plan.  These measures are particularly important, as they allow beneficiaries to compare health plans based on quality.

43.     CMS prominently displays Star Ratings in its online and print resources on available MA Plans as required under the SSA.  *See* 42 U.S.C. § 1395w–21.

44.     Indeed, through the online Medicare Plan Finder tool, CMS displays MA Plans in highest to lowest Star Ratings order to prospective members, with the express purpose of guiding beneficiaries to higher-rated plans first.

45.     The Star Ratings also impact the amount of funds CMS will pay to each MA Plan.

46.     Under Section 1853(o) of the SSA, CMS allocates quality bonuses to MA Plans based on their Star Ratings and awards additional funds to MA Plans rated at or above 4 stars. *See* 42 U.S.C. § 1395w–23.  MA Plans use these bonuses, which are often in the tens, if not hundreds of millions, of dollars, to provide additional benefits and services to further improve care to their members.

47.     Conversely, MA Plans that consistently receive Star Ratings below 3 stars may be terminated from the Medicare Advantage program altogether.  *See* 42 C.F.R. § 162(b); 42 C.F.R. § 422.166(h)(1)(ii).

48.     Thus, the Star Ratings have tremendous value to and impact on MA Plans to provide quality care and benefits to their members, compete in the marketplace, receive compensation, and even remain eligible to continue to participate in the Medicare Advantage program.

***Calculation Of Star Ratings Generally***

49.     To calculate Star Ratings, CMS must use clear and unambiguous calculations established in its regulations.  *See* 42 C.F.R. § 422.162(b); 42 C.F.R. § 422.166(h)(1)(ii).

50.     Star Ratings for MA Plans are based on a calculation of numerous performance measures designed to assess member services and care, including but not limited to preventative health services, management of long-term conditions, member experiences with the health plan, member complaints, and customer service.  *See Medicare 2024 Part C & D Star Ratings Technical Notes* at 26-100, CENTERS FOR MEDICARE AND MEDICAID SERVICES, https://www.cms.gov/files/document/2024technotes20230929.pdf.

51.     CMS publishes these measures and the specifications that it uses to develop its Star Ratings.  MA Plans (including SCAN) use them to target areas of improvement and investment to ensure they are maximizing their care and services for beneficiaries, and in turn, earn higher Star Ratings.

52.     Any changes to the Star Ratings calculations can have serious, and sometimes catastrophic, impacts on MA Plans.

53.     When MA Plans' Star Ratings fall, they may be disqualified from receiving quality bonus payments and can even be removed from the Medicare Advantage program altogether, resulting in devastating financial and coverage consequences for the plans and their beneficiaries.

54.     Therefore, in developing each MA Plan's Star Ratings, CMS must treat each MA Plan "fairly and equally," judging them only on matters that are "under the control of the health or drug plan," in a system that will "minimize unintended consequences" adopted through a

"process of developing [a ratings methodology that] is transparent and allows for multi-stakeholder input."  83 Fed. Reg. 16440, 16521.

55.     CMS calculates Star Ratings based on a rigid methodology – set forth in its own regulations – that focuses on "health and drug plan quality and performance measures."  42 C.F.R. § 422.166; Medicare 2024 Part C & D Star Ratings Technical Notes at 2 & 26-100.

56.     Measures used to calculate Star Ratings can be grouped into two categories: those from the Consumer Assessment of Healthcare Providers and Systems surveys ("CAHPS"), and those from "non-CAHPS" sources.  Medicare 2024 Part C & D Star Ratings Technical Notes, at 2 & 26-73.

57.     CAHPS measures relate to member experience with healthcare providers, services, and plans, deriving data from "surveys that ask consumers and patients to evaluate the interpersonal aspects of health care."  42 C.F.R. § 422.162(a).  In other words, they measure the member experience.

58.     Non-CAHPS measures derive data from sources other than CAHPS surveys.  *See* Medicare 2024 Part C & D Star Ratings Technical Notes, at 4.  Non-CAHPS measures consist of data from, among other sources, the Healthcare Effectiveness Data and Information Set[2] and CMS's Part C and D reporting requirements.  *Id.* at i.

59.     Each CAHPS and non-CAHPs measure is given a numeric score.  *Id.* at 2.

---

[2]  The Healthcare Effectiveness Data and Information Set ("HEDIS") is a tool used by more than 90 percent of U.S. health plans to measure performance on important dimensions of care and service.  More than 190 million people are enrolled in health plans that report quality results using HEDIS. *See* Healthcare Effectiveness Data and Information Set (HEDIS) - Healthy People 2030 | health.gov (last visited Dec. 29, 2023).

60.     The agency then determines the "cut point" for each measure – that is, the range of scores that correspond with particular Star Ratings.[3]

61.     The statistical method used to calculate the cut points differs for CAHPS and non-CAHPS measures.  *Id.* at 8.

62.     CAHPS measures employ a relative distribution and significance testing method,[4] while non-CAHPS measures are subject to a clustering sampling method.  *Id.*

63.     Together, the CAHPS and non-CAHPS measure scores and cut points are combined to develop each MA Plan's Star Ratings.

### *CMS Adopts Guardrail Requirements As Part Of The Star Ratings Methodology*

64.     On June 2, 2020, CMS promulgated a final rule establishing a new methodology for the calculation of Star Ratings.  *See* 85 Fed. Reg. 33796.  The new methodology was supposed to be applied starting in 2021, but was delayed because of the COVID-19 pandemic.

65.     The final rule modified the methodology for non-CAHPS measures in two critical ways.

---

[3]  For instance, the 2023 cut points for measure C11 (Controlling Blood Pressure) – which is measured as a percentage – were the following: below 39% for 1 Star, between 39% and 62% for 2 Stars, between 62% and 75% for 3 Stars, between 75% and 83% for 4 Stars, and above 83% for 5 Stars.  *See* Medicare 2023 Part C & D Star Ratings Technical Notes, at 45-47.

[4]  Clustering sampling is defined by CMS as a "variety of techniques used to partition data into distinct groups such that the observations within a group are as similar as possible to each other, and as dissimilar as possible to observations in any other group."  42 C.F.R. § 422.162(a). Clustering of the measure-specific scores means "that gaps that exist within the distribution of the scores are identified to create groups (clusters) that are then used to identify the four cut points resulting in the creation of five levels (one for each Star Rating), such that the scores in the same Star Rating level are as similar as possible and the scores in different Star Rating levels are as different as possible."  *Id.*

66.     *First*, the final rule explained that, starting in 2024, the Tukey outlier deletion method would be used in developing the cut points for non-CAHPS measures.  *See* 42 C.F.R. § 422.166(a)(2).[5]

67.     *Second*, and most importantly, the final rule implemented "guardrails" or "bi-directional caps that restrict upward and downward movement of a measure's cut points" from one year to the next.  *Id.*[6]

68.     Specifically, the guardrail prevents each measure's cut points from fluctuating more than 5% (upward or downward) from that of the previous year, thereby promoting stability in Star Ratings year over year.  *See generally* 85 Fed. Reg. 33796-33911.

69.     CMS thus adopted the guardrail requirement to provide stability and predictability from year-to-year.  *See generally id.*

70.     According to the regulation, CMS is supposed to rely on the actual cut points from the prior year to determine and calculate the guardrail to measure the cut points that ultimately would be used to develop the Star Ratings for the MA Plans.

71.     CMS explained that it would incorporate the "guardrail so that the measure-threshold-specific cut points for non-CAHPS measures do not increase or decrease more than the value of the cap from 1 year to the next."  *Id.*

72.     Under the final rule, therefore, to calculate the 2024 Star Ratings cut points, CMS is required to remove Tukey outliers from its methodology and then apply the guardrail caps for

---

[5] Tukey outlier deletion is a "standard statistical methodology for removing outliers, to increase the stability and predictability of the star measure cut points."  85 Fed. Reg. 33798.

[6] A guardrail is defined by CMS as "a bidirectional cap that restricts both upward and downward movement of a measure threshold-specific cut point for the current year's measure-level Star Ratings as compared to the prior year's measure-threshold-specific cut point."  42 C.F.R. § 422.162(a).

each measure's cut points compared to the actual 2023 cut points.  *See* 42 C.F.R. § 422.166(a)(2)(i).

73.    Doing so is supposed to prevent the 2024 cut points from deviating more than 5% from the 2023 cut points, thereby bringing stability to the calculations and process for MA Plans and Star Ratings.  *Id.*

***CMS's Arbitrary Rejection Of Its Own Methodology
To Develop The 2024 Star Ratings Caused SCAN's Star Ratings To Drop***

74.    Based on its high-quality care and services, SCAN has historically received top-tier Star Ratings that are critical to its operations and ability to serve its members.

75.    Indeed, SCAN has received Star Ratings of 4.5 out of 5 from 2019 through 2023.

76.    As previously noted, due to the COVID-19 pandemic, CMS delayed implementing its guardrail requirement for two years until 2023, when it was supposed to use that requirement to establish the 2024 Star Ratings.  *See* 87 Fed. Reg. 22776.

77.    Thus, 2023 was the first time that CMS implemented its guardrail requirement, when it established its 2024 Star Ratings.  *See id.*

78.    In August 2023, CMS notified MA Plans, including SCAN, of the first "plan preview" of their 2024 Star Ratings, which provided the data and scores for each measure, but not the actual Star Ratings.

79.    Later, in September 2023, CMS notified SCAN and other MA Plans of the second plan preview for their 2024 Star Ratings.  The second plan preview included CMS's preliminary Star Ratings.

80.    SCAN's preliminary 2024 Star Ratings dropped precipitously to *3.5 stars* – far lower than its historically high ratings.

81.     SCAN immediately contacted CMS for an explanation of the sudden and surprising drop in its Star Ratings.

82.     In response, CMS advised that "the 2023 Star Ratings cut points were rerun . . . and [t]hese *rerun* 2023 Star Ratings cut points serve as the basis for the guardrails for the 2024 Star Ratings."  *See* Exhibit ("Ex.") 1, CMS Stars Mailbox Correspondence on Sept. 8, 2023. That is to say, in computing SCAN's 2024 Star Ratings, CMS used rerun simulated 2023 cut points data.

83.     But CMS's own regulation requires it to rely on the previous year's *actual* cut points and data – not simulated, rerun data.  *See* 42 C.F.R. § 422.166(a)(2).

84.     Nevertheless, CMS rejected the methodology set forth in the regulation, and refused to consider actual cut points for the prior year.

85.     And the results were just as dire as expected: MA Plans' Star Ratings fluctuated wildly, and well-beyond the 5% caps on cut point swings that the guardrails are supposed to impose.

86.     For 2024 Star Ratings, CMS's cut point for measure D01 (Call Center – Foreign Language Interpreter and TTY Availability) associated with a 3-Star Rating fluctuated from 64% to 86% – a difference of 22% – and the 4-Star Rating fluctuated from 80% to 96% – a difference of 16%.[7]

87.     Those fluctuations well-exceed the 5% cap on fluctuations that the guardrails are supposed to provide.

---

[7] *See* https://www.cms.gov/medicare/health-drug-plans/part-c-d-performance-data (last visited Dec. 29, 2023).

88.    Thus, SCAN's 2024 Star Ratings significantly dropped as a result of CMS's failure to apply its own regulations.

89.    Had CMS followed the regulation as written, SCAN's Star Rating would have been 4 stars, rather than 3.5 stars.

90.    CMS's failure to follow its own regulation resulted in the very thing that the guardrails were designed and intended to prevent: wild fluctuations in cut points that impact MA Plans' Star Ratings.

91.    SCAN alerted CMS to its flawed methodology, explaining that the regulation requires CMS to apply the guardrail to actual cut points from the prior year, not to rerun data that effectively amount to simulated data points.  SCAN also advised CMS that this flawed approach undermines the purpose and policy of the regulation to reduce wild fluctuations in ratings.  *See* Ex. 2, CMS Stars Mailbox Correspondence on Sept. 11, 2023.

92.    Rerunning the 2023 data is inconsistent with the plain and express language of the regulation, which calls for comparison between the current and prior year's actual and measure-specific-threshold cut points.  *See* 42 C.F.R. § 422.166(a)(2)(i).  It also frustrates the very purpose of CMS's guardrail regulation, which is to reduce risk and uncertainty for MA Plans by preventing dramatic swings in cut points and resulting ratings that can have massive adverse impacts on MA Plans and beneficiaries.

93.    By its express terms, CMS's regulation does not permit the agency to recalculate the prior year's cut points for the purposes of generating and applying the guardrails.  *See* Ex. 2.

94.    When confronted with the flaws in its approach, CMS asserted that statements in its preamble to its final rule related to the use of Tukey outliers somehow permitted its departure from the regulation's actual text.  *Id.*; 85 Fed. Reg. 9044; 85 Fed. Reg. 33833.

95.     CMS further asserted that the authority to use rerun cut points was an unstated but "intrinsic part" of the agency's rule that it had every intention of applying.  *See* Ex. 3, CMS Stars Mailbox Correspondence on Sept. 22, 2023.

96.     Despite SCAN's efforts to further discuss and resolve its concerns, CMS refused to meaningfully engage with SCAN or reconsider its flawed approach and grave impacts of it.

97.     As such, CMS ultimately released its final 2024 Star Ratings on October 13, 2023, where it rated SCAN at 3.5 Stars – a significant reduction from its past ratings, and a rating that is not "a true reflection of the plan's quality."  83 Fed. Reg. 16440, 16521 (Apr. 16, 2018).

### CMS Used Other Flawed And Improper Data
### To Calculate SCAN's Star Ratings

98.     CMS also relied on incorrect and disputed data for the "customer service" criteria to calculate SCAN's Star Ratings, which includes additional measures such as the "Call Center" measure.

99.     As part of the Call Center measure, CMS audits the "Call Center - Foreign Language Interpreter and TTY Availability" of MA Plans.

100.    This measure calculates the number of completed contacts in which a caller can "establis[h] contact with an interpreter and confir[m] that the customer service representative can answer questions about the plan's [health] benefit[s] within eight minutes."  *See* Medicare 2024 Part C & D Star Ratings Technical Notes, at 73.

101.    As part of this measure, CMS hires auditors – commonly referred to as "secret shoppers" – to pose as a beneficiary and call SCAN's customer service line.

102.     On February 9, 2023, a CMS secret shopper posed as a French-speaking beneficiary, called SCAN's member services line, and asked to speak to "the right person to respond to questions concerning medical benefits of" a particular SCAN product.

103.     During this call, SCAN's team connected the secret shopper with a French interpreter after 6 minutes and 35 seconds and substantively answered the question within 7 minutes and 30 seconds from when the secret shopper called, well within the eight-minute timeframe set by CMS.  *See* Medicare 2024 Part C & D Star Ratings Technical Notes, at 73.

104.     CMS, however, identified the call as outside the eight-minute timeframe because additional time was required upfront to clarify and understand the secret shopper's poorly phrased and confusing inquiry about SCAN's product.

105.     Specifically, the secret shopper, speaking in French, used an ambiguous expression to refer to "medical benefits" – which has multiple and confusing English meanings – and also spelled the SCAN product name in a confusing manner.

106.     Because of the ambiguity, the interpreter could not understand the question the first time and thus asked the secret shopper to repeat his question, causing additional delays in SCAN's ability to resolve the inquiry.

107.     Additionally, the secret shopper spoke unusually slow and in a non-standard manner, including using confusing pauses that interrupted the shopper's own questions as they were asked.  The secret shopper in fact spent approximately 25 seconds asking a single question, demonstrating the length of the pauses and self-made interruptions.

108.     The delays and confusing pauses forced the interpreter to ask the shopper to repeat the question, adding an additional and unnecessary 34-second delay.

109.    Thus, while SCAN substantively resolved the secret shopper's question within 7 minutes and 30 seconds, the call in total exceeded 8 minutes because of the ambiguity and errors in CMS's questions and the manner in which it was asked.

110.    Despite these errors and the flawed data it provided, CMS nevertheless included this specific secret shopper's call as a data point in SCAN's Star Rating, which directly and adversely impacted its rating due to the extensive time it took to rectify the issues caused by the secret shopper's flawed translation and conduct.

111.    Indeed, the February 9, 2023, call alone triggered a reduction in SCAN's Star Ratings.  Without the call, SCAN's Star Ratings would have been 4 stars.

### Defendants' Unlawful Conduct Has Harmed – And Continues To Harm – SCAN

112.    Defendants' refusal to abide by their own regulation threatens to cause severe and irreparable harm to SCAN.

113.    By applying some newfound "intrinsic" methodology to calculate guardrails, rather than its actual regulation, Defendants have used simulated, rerun data to calculate SCAN's Star Ratings.

114.    Defendants have further improperly considered the flawed secret shopper call.

115.    As a result, Defendants have issued a fundamentally flawed Star Ratings for SCAN of 3.5 stars.

116.    The impact of that significant drop in SCAN's Star Ratings is serious and substantial.

117.    By reducing SCAN's 2024 Star Ratings, CMS has rendered SCAN ineligible for quality bonus payments in 2025, thereby impacting its operations and ability to provide enhanced benefits and lower premiums to beneficiaries.

118.    The reduced Star Ratings and accompanying consequences have also undermined SCAN's competitive position, reputation, and goodwill, and impacted its ability to compete against competitors, including those that may have benefited from Defendants' flawed and unlawful methodology.

119.    Additionally, as a result of CMS's flawed rating methodology and reliance on flawed data, beneficiaries may, based on its Star Ratings, mistakenly conclude SCAN's offerings are inferior or lower in quality compared to the offerings of its competitors.

120.    SCAN has tried to resolve the parties' dispute informally to no avail.  Exs. 1-3.

121.    Left with no other option, SCAN turns to this Court to require Defendants to comply with federal law, vacate the flawed Star Ratings assigned to SCAN, and enjoin them from relying on that unlawful rating in connection with SCAN's eligibility for quality bonus payments.

### COUNT I
**(Violation Of 5 U.S.C. § 706(2)(A) – Against All Defendants)**
**(Use Of Simulated And Rerun Cut Point Data)**

122.    SCAN realleges the allegations set forth in Paragraphs 1 through 121 of this Complaint as if fully set forth herein.

123.    CMS's decision – as approved and directed by Defendants – to use simulated and rerun 2023 cut point data to calculate SCAN's 2024 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2) and 42 C.F.R. § 422.260(c)(3).

124.    SCAN is adversely affected and aggrieved by Defendants' action.

125.    Defendants' decision to use simulated and rerun cut point data for 2023 is arbitrary and capricious and contrary to law.

126.     Defendants failed to engage in reasoned decision-making; to reasonably (or at all) explain their departure from CMS's own regulation; or to provide an adequate and reasonable explanation for their decision.

127.     Defendants' action flies in the face of the plain and unambiguous text of their own regulation and undermines the policy and purpose of that regulation to reduce Star Ratings swings that harm MA Plans and beneficiaries.

128.     Defendants acted unreasonably and contrary to law by deploying a methodology that is inconsistent with the approach mandated by their regulation, and was never disclosed to regulated parties – let alone adopted pursuant to any proper rulemaking proceedings.

129.     As a result, Defendants' decision is arbitrary, capricious, and otherwise not in accordance with the law in violation of 5 U.S.C. § 706(2)(A).

130.     SCAN has suffered and will continue to suffer irreparable harm as a result of Defendants' violations of 5 U.S.C. § 706(2)(A).

131.     SCAN is entitled to injunctive and declaratory relief to remedy Defendants' unlawful conduct, as well as all other relief as set forth in its Prayer for Relief.  *See* 5 U.S.C. § 705.

## COUNT II
### (Violation Of 5 U.S.C. § 706(2)(A) – Against All Defendants)
### (Use Of Flawed Call Input)

132.     SCAN realleges the allegations set forth in Paragraphs 1 through 121 of this Complaint as if fully set forth herein.

133.     CMS's inclusion of the February 9, 2023, secret shopper call – as approved and directed by Defendants – to calculate SCAN's performance on the Foreign Language Interpreter

and TTY Availability measure for the 2024 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2) and 42 C.F.R. § 422.260(c)(3).

134.    SCAN is adversely affected and aggrieved by the use of this flawed data measure.

135.    Defendants' decision to consider the improper and flawed secret shopper call is arbitrary and capricious and contrary to law.

136.    Defendants failed to engage in a reasoned decision-making; to consider important aspects of the problem they believed they faced; to consider the impact that the secret shopper call would have on SCAN's Star Ratings; to provide an adequate explanation for their decision to consider an improper secret shopper call that was flawed as a result of Defendants' own mishandling as part of SCAN's Star Ratings; and considered the secret shopper call even though contrary evidence demonstrated it should never have been considered.

137.    The use of this data to calculate SCAN's 2024 Star Ratings is arbitrary, capricious, and otherwise not in accordance with the law in violation of 5 U.S.C. § 706(2)(A).

138.    SCAN has suffered and will continue to suffer irreparable harm as a result of Defendants' violations of 5 U.S.C. § 706(2)(A).

139.    SCAN is entitled to injunctive and declaratory relief to remedy Defendants' unlawful conduct, as well as all other relief as set forth in its Prayer for Relief.  *See* 5 U.S.C. § 705.

## COUNT III
### Declaratory Judgment

140.    SCAN realleges and incorporates Paragraphs 1 through 121 as if fully set forth herein.

141.    CMS's calculation of the 2024 Star Ratings is a final agency action made reviewable by 5 U.S.C. § 706(2).

142.    SCAN is adversely affected and aggrieved by the calculation of its Star Ratings.

143.    An actual controversy has arisen and exists between SCAN and Defendants regarding Defendants' calculation of SCAN's 2024 Star Ratings using simulated and rerun 2023 data and a flawed audit call.

144.    SCAN requests a declaration from this Court under 28 U.S.C. § 2201 that Defendants' calculation is arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SCAN prays that this Court vacate SCAN's 2024 Star Ratings and remand this matter to the agency for further consideration.  Additionally, SCAN requests the Court to:

1.    Adopt an expedited schedule to resolve the merits of this Complaint;

2.    Declare that:

- Defendants' rerunning of the 2023 cut points to calculate SCAN's 2024 Star Ratings directly conflicts with CMS's regulatory requirements and is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A);

- Defendants' consideration of the February 9, 2023, flawed and improper Foreign Language Interpretation call to calculate SCAN's 2024 Star Ratings is arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A); and

- Defendants must recalculate SCAN's 2024 Star Ratings in compliance with CMS's final rule, specifically considering actual performance data and excluding consideration of the secret shopper call.

3.    An injunction:

- Preventing Defendants from using SCAN's 2024 Star Ratings in connection with any quality bonus payment eligibility decisions.

4.    Award SCAN its reasonable attorney's fees and costs, as permitted by law; and

5.    Grant such other further relief as this Court deems just and proper.

Dated: December 29, 2023

By: _____
Paul Werner (D.C. Bar #482637)
Sheppard, Mullin, Richter &
Hampton LLP
2099 Pennsylvania Ave N.W., Suite 1000
Washington, D.C. 20006
Tel. 202-747-1900
pwerner@sheppardmullin.com

*Counsel for SCAN Health Plan*